IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ERIC CONKLIN | : | CIVIL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  22-509 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    September 28, 2023

Eric Conklin ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final decision denying his application for supplemental security income ("SSI").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence.

I.     **PROCEDURAL HISTORY**

Plaintiff protectively filed an application for SSI on February 23, 2018, alleging disability beginning in May 2010, as a result of human immunodeficiency virus ("HIV"); neuropathy, unspecified; migraine, unspecified, not intractable; seizures/convulsions; unspecified anxiety disorder; antisocial personality disorder; and unspecified insomnia disorder.  Tr. at 83, 336, 393.[1]  His application was denied at the initial level of review. Id. at 84-95, 137-41.  At his request, id. at 145, an administrative hearing was held before

---

[1]Plaintiff previously filed for -- and received -- benefits as a minor in 1993, 1996, and 2003, and as an adult in 2010.  See tr. at 389; see also id. at 58.  The benefits ceased when Plaintiff was incarcerated, and the present application was protectively filed within days of his release.  Id. at 61-62, 775 (Plaintiff reported incarceration from 2007 to 2010 and 2011 to 2018).

an ALJ on September 26, 2019, id. at 56-82, at which Plaintiff amended his alleged onset date to February 23, 2018.  Id. at 61.  On January 22, 2020, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled.  Id. at 99-122.  Plaintiff requested review by the Appeals Council, which vacated the ALJ's decision on February 19, 2021, because the ALJ denied counsel's request for vocational interrogatories and/or a supplemental hearing to obtain vocational expert ("VE") testimony, and remanded the matter back to the ALJ for further administrative proceedings.  Id. at 130-31.

The same ALJ held a second administrative hearing on July 21, 2021, tr. at 38-55, at which Plaintiff amended the relevant period to end on August 1, 2020, because he started working.  Id. at 44.  On July 30, 2021, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled during the closed period between February 27, 2018, and August 1, 2020.  Id. at 14-30.  The Appeals Council denied Plaintiff's request for review on December 7, 2021, id. at 1-7, making the ALJ's July 30, 2021 decision the final decision of the Commissioner.  20 C.F.R. § 416.1472.

Plaintiff commenced this action in federal court on February 8, 2022.  Doc. 1.  The matter is now fully briefed and ripe for review.  Docs. 10, 11 & 14.[2]

## II.   **LEGAL STANDARD**

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

---

[2]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantially gainful activity ("SGA");
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments" ["Listings"], 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

3

See <u>Zirnsak</u>, 777 F.3d at 610; <u>see also</u> 20 C.F.R. § 416.920(a)(4).   Plaintiff bears the

burden of proof at steps one through four, while the burden shifts to the Commissioner at

the fifth step to establish that the claimant is capable of performing other jobs in the local

and national economies, in light of his age, education, work experience, and RFC.  <u>See</u>

<u>Poulos v. Comm'r of Soc. Sec.</u>, 474 F.3d 88, 92 (3d Cir. 2007); <u>see</u> <u>also</u> <u>Biestek v.</u>

<u>Berryhill</u>, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only –

'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion'") (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).   The

court has plenary review of legal issues.  <u>Schaudeck</u>, 181 F.3d at 431.

## III.   <u>DISCUSSION</u>

Plaintiff was born on October 28, 1986, and thus was thirty-one years of age at the

time of his amended alleged disability onset date (February 23, 2018) and thirty-three at

the end of the amended closed period (August 1, 2020).  <u>Tr.</u> at 336, 388.[3]  He is six feet,

three inches tall, and weighs approximately 181 pounds.  <u>Id.</u> at 393.  Plaintiff is single

and divides living with his aunt and his father.  <u>Id.</u> at 62.[4]  He completed the ninth grade.

<u>Id.</u> at 50, 62-63, 393.[5]  He has no past relevant work.  <u>Id.</u> at 63, 394.

---

[3]The transcript of the second hearing (July 8, 2021) reflects that Plaintiff testified
he was born on October 28, 1996.  <u>Tr.</u> at 40.  I conclude that this a typographical error in
light of all other indications in the record, including Plaintiff's testimony at the first
hearing (Sept. 26, 2019) that he was 32 years of age.  <u>Id.</u> at 62.

[4]In a Function Report dated March 26, 2018, Plaintiff indicated that he lived in a
shelter following his release from prison.  <u>Tr.</u> at 402, 405.

[5]At his first administrative hearing, Plaintiff testified that he started the tenth grade
but could not remember if he "passed."  <u>Tr.</u> at 62-63.  On April 17, 2018, Plaintiff told a

A.    **ALJ's Findings and Plaintiff's Claims**

In the July 30, 2021 decision under review, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity during the closed period at issue. Tr. at 16. At step two, the ALJ found that Plaintiff suffers from the severe impairments of HIV, posttraumatic osteoarthritis of the right shoulder, bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), and posttraumatic stress disorder ("PTSD"). Id. at 17.[6]  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings. Id. at 18.  Furthermore, in reviewing the "paragraph B" criteria of the relevant mental health Listings, the ALJ found that Plaintiff had moderate limitation in the areas of interacting with others and concentrating, persisting or maintaining pace, and mild limitation in the areas of remembering or applying information and managing oneself. Id. at 19-21.

In his RFC assessment, the ALJ determined that Plaintiff retains the RFC to perform medium work, except that he can reach occasionally overhead and frequently in any direction with the right upper extremity;[7] can never climb ladders, ropes, or scaffolds; can never work at unprotected heights; can occasionally be exposed to machinery, humidity, wetness, vibrations, and extreme cold and heat; and is restricted to

---

biosocial evaluator that he was attempting to obtain his General Equivalency Degree ("GED"). Id. at 788.

[6]Where appropriate, Plaintiff's impairments will be defined in the medical evidence summary.

[7]Plaintiff is right-handed.  Tr. at 52, 68.

5

simple, routine tasks, with simple work-related decisions and occasional contact with the public, supervisors, and co-workers.  Id. at 21-22.  Based on the testimony of a VE, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy.  Id. at 29.  As a result, the ALJ concluded that Plaintiff was not disabled.  Id. at 30.

Plaintiff argues that the ALJ (1) erroneously considered the mental health opinion evidence and (2) failed to include all credibly established mental limitations in the hypothetical questions posed to the VE.  Docs. 10 & 14.  Defendant responds that the ALJ's decision is supported by substantial evidence.  Doc. 11.

### B.   Medical Evidence Summary[8]

On May 10, 2010 (when Plaintiff was 23), State agency psychological consultant John Gavazzi, Psy.D., completed a Psychiatric Review Technique ("PRT") form.  Tr. at 1161-73.  Dr. Gavazzi noted that Plaintiff had been treated for ADHD since the age of ten.  Id. at 1173.[9]  The doctor opined that Plaintiff had moderate restriction of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or

---

[8]Because Plaintiff's claims concern the ALJ's consideration of Plaintiff's mental health impairments, this medical summary will focus on his mental health records. Records from outside the relevant period will be discussed for purposes of context.

[9]"The essential feature of [ADHD] is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development.  *Inattention* manifests behaviorally in ADHD as wandering off task, lacking persistence, having difficulty sustaining focus, and being disorganized and is not due to defiance or lack of comprehension.  *Hyperactivity* refers to excessive motor activity . . . when it is not appropriate, or excessive fidgeting, tapping, or talkativeness."  Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5"), at 61 (emphasis in original).

6

pace, and one or two repeated episodes of decompensation, each of extended duration. Id. at 1171. Plaintiff had a medically documented history of chronic organic mental, schizophrenic, or affective disorders of at least two years' duration that had caused more than a minimal limitation of his ability to do basic work activity, and a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate. Id. at 1172-73.

On February 27, 2018 (age 31), Plaintiff's amended alleged onset date, a mental health contact note documented his condition at the time of release from incarceration. Tr. at 576-78. Plaintiff presented as stable, maintained good eye contact and broad affect, and denied any current mental health issues. Id. at 576. The mental health assessment yielded normal results, with no impairments noted. Id. at 577.

On March 14, 2018, Plaintiff underwent a mental status assessment as part of his inpatient admission at Pennsylvania Hospital ("Hall-Mercer"). Tr. at 771-74. Plaintiff was living in a shelter since his release from prison and sought treatment for anxiety and depression. Id. at 771. He had psychiatric hospitalizations as a minor, the last one occurring in 2003, id., and he took various psychotropic medications while incarcerated, including Seroquel, Depakote, Celexa, Zyprexa, Wellbutrin, and trazadone,[10] all of which

---

[10]Seroquel (generic quetiapine) is used to treat schizophrenia and bipolar disorder. See https://www.drugs.com/seroquel.html (last visited Sept. 14, 2023). Depakote (generic divalproex sodium) is used to, among other things, treat manic episodes related to bipolar disorder. See https://www.drugs.com/depakote.html (last visited Sept. 14, 2023). Celexa (generic citalopram) is an antidepressant used to treat depression and major depressive disorder ("MDD"). See https://www.drugs.com/Celexa.html (last

were stopped in December 2017.  Id. at 773.  Plaintiff indicated that he had experienced

or witnessed a traumatic event;[11] reported current symptoms of racing thoughts,

insomnia, and irritability, with pressured speech; and identified family and friends as his

sources of support and strength.  Id.  A mental status examination ("MSE") revealed

essentially normal findings.  Id. at 772-73.  Plaintiff desired a new medication regimen

and psychotherapy to prevent the angry outbursts like the ones which resulted in his

incarceration.  Id. at 773.  The assessor diagnosed Plaintiff with bipolar 1 disorder, most

recent (or current) episode unspecified.  Id. at 774.[12]  A Comprehensive Biosocial

Evaluation performed on April 2, 2018, documented additional complaints such as fear of

---

visited Sept. 14, 2023).  Zyprexa (generic olanzapine) is an antipsychotic medication
used to treat schizophrenia and bipolar disorder.  See
https://www.drugs.com/zyprexa.html (last visited Sept. 14, 2023).  Wellbutrin (generic
bupropion) is an antidepressant used to treat MDD and seasonal affective disorder.  See
https://www.drugs.com/wellbutrin.html (last visited Sept. 14, 2023).  Trazadone is an
antidepressant used to treat MDD.  See https://www.drugs.com/trazodone.html (last
visited Sept. 14, 2023).

[11]Plaintiff reported witnessing the shooting death of his sister when he was nine
years of age.  Tr. at 778.

[12]The features of bipolar I disorder are a manic episode accompanied by specific
additional symptoms which may have been preceded by and may be followed by
hypomanic or depressive episodes.  DSM-5 at 123, 127.  A hypomanic episode consists
of a "distinct period of abnormally and persistently elevated, expansive, or irritable mood
and abnormally and persistently increased activity or energy, lasting at least 4
consecutive days and present most of the day, nearly every day."  Id. at 124.  A major
depressive episode is characterized by five or more of the following symptoms present
during the same two-week period and represent a change from previous function:
depressed mood most of the day, markedly diminished interest or pleasure in all, or
almost all, activities most of the day, nearly every day, significant weight loss when not
dieting or weight gain, insomnia or hypersomnia, psychomotor agitation or retardation,
fatigue, feeling of worthlessness diminished ability to think or concentrate, and recurrent
thoughts of death.  Id. at 125.

dying/losing control, compulsions, panic attacks (as recently as two weeks prior), and homicidal ideation in connection with his sister's death. Id. at 777-79.

On April 17, 2018, psychiatrist Jenny Yu, M.D. of Hall-Mercer performed an MSE of Plaintiff. Tr. at 787-92. Plaintiff described his mood as "frustrated, pissed off, overwhelmed, a little bit lay back" and he exhibited an anxious affect, with otherwise normal examination findings. Id. at 787. Dr. Yu diagnosed Plaintiff with PTSD with flashbacks, nightmare, and avoidance,[13] bipolar disorder with current episode depressed, and ADHD, as well as asthma, neuropathy, a history of substance abuse, and HIV. Id. at 788-91. The doctor prescribed Seroquel and clonidine, id. at 797,[14] and discharged him with recommendations for medication to treat his mood issues, trauma-focused treatment for his PTSD, and vocational training and job hunting, with a referral to outpatient psychotherapy. Id. at 791-92.

On April 13, 2018, State agency psychological consultant Ray M. Milke, Ph.D., completed a PRT and mental RFC as part of the initial disability determination. Tr. at 88-89, 91-94. Dr. Milke indicated that Plaintiff's depressive, bipolar and related disorders were severe, and assessed him under the Listings for anxiety and obsessive-compulsive disorders, and personality and impulse-control disorders. Id. at 88. The doctor opined that Plaintiff had mild limitation in understanding, remembering, or

---

[13]The essential feature of PTSD is the development of characteristic symptoms following exposure to one or more traumatic events, as well as persistent avoidance of stimuli associated with the traumatic event(s). DSM-5 at 274-75.

[13]Clonidine is used to treat hypertension and ADHD. See https://www.drugs.com/clonidine.html (last visited Sept. 13, 2023).

applying information; moderate limitation in interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and mild limitation in adapting or managing oneself.  Id.  The doctor further opined that Plaintiff was not significantly limited in understanding and retaining information, or in sustaining concentration and persistence.  Id. at 92.  In the area of social interactions, Plaintiff was moderately limited in his ability to interact appropriately with the general public, but not otherwise significantly limited; and in the area of adaptation, he was moderately limited in his ability to respond appropriately to changes in a work setting, but not otherwise significantly limited.  Id. at 92-93.  Dr. Milke opined that Plaintiff retained the ability to understand, remember, and follow simple instructions and directions, and that he could do simple, routine, and repetitive activities and could follow simple one- to two-step instructions and directions.  Id. at 93-94.

On May 15, 2018, Plaintiff began outpatient treatment at Hall-Mercer with Dr. Yu and case manager Hilary Coulter, LSW.  Tr. at 850-71.  The objective of treatment was for Plaintiff to learn and implement calming skills to reduce and manage his anxiety symptoms, through therapy and medication.  Id. at 863, 867, 869.  The records describe Plaintiff as "dedicated to coming in regardless of lengthy commute" and note that he is "organized and keeps a planner of all appointments."  Id. at 868.  On February 11, 2019, Dr. Yu added Adderall to Plaintiff's medication regimen.  Id. at 874.[15]

---

[15]Adderall (amphetamine and dextroamphetamine) is used to treat ADHD.  See https://www.drugs.com/adderall.html (last visited Sept. 14, 2023).

On March 25, 2019, Dr. Yu performed an MSE of Plaintiff.  Tr. at 1072.  Plaintiff appeared well-groomed and cooperative, with good eye contact, normal movements, normal speech, and euthymic affect within the normal range.  Id.  He exhibited linear and logical thought processes, intact cognition, and fair insight and judgment, with no obvious delusions, no suicidal or homicidal ideation, and no auditory or visual hallucinations.  Id.  Dr. Yu assessed Plaintiff as "[o]verall doing OK, [and] benefiting from the current medication regimen," which consisted of Seroquel, clonidine and Adderall.  Id.

On April 1, 2019, Dr. Yu completed a medical source statement regarding Plaintiff's ability to do work-related activities (mental).  Tr. at 1144-45.  Dr. Yu opined that Plaintiff was seriously limited or limited but satisfactory in all but one work-related mental ability (adhering to basic standards of neatness and cleanliness), and that he would be absent from work more than three days per month.  Id.[16]  In response to an accompanying interrogatory, Dr. Yu further opined that Plaintiff's mental disorder was "serious and persistent," explaining that he has been "enrolled in mental health treatment since childhood" and that his "attention issues and difficulty with authority make changes and new demands difficult for him."  Id. at 1146.

On June 10, 2019, Dr. Yu noted Plaintiff's concern that clonidine may have had a negative effect on his HIV medication, but otherwise Plaintiff reported being busy with

---

[16]The form defines "Limited but satisfactory" to mean that the patient has a noticeable difficulty no more than ten percent of the workday or work week, and "Seriously limited" to mean the difficulty is noticeable from 11 to 20 percent of the workday or work week.  Tr. at 1144.

11

issues at home, that he had lost a job, and that his psychiatric medications have been helpful.  <u>Tr.</u> at 1016.  Plaintiff's MSE indicated that his mood was "worried," with normal findings identical to those found in April 2019.  <u>Id.</u> at 1017.  On July 15, 2019, Ms. Coulter noted that Plaintiff had obtained his driver's license "and has been enjoying the freedom and driving around independent," and that he was worried about his grandmother's health.  <u>Id.</u> at 989.  On August 16, 2019, Ms. Coulter noted that Plaintiff continued to have racing thoughts and anxiety, particularly over his family's health, in response to which the therapist told him to remember that he was "experiencing a particularly stressful time in his life and some of that anxiety is natural."  <u>Id.</u> at 963.

On September 18, 2019, Ms. Coulter submitted a letter indicating she has seen Plaintiff for one-on-one therapy sessions and over the last year he attempted to work jobs and maintain employment, but that doing so is a "consistent struggle."  <u>Tr.</u> at 2182.  She also noted difficulty with interactions with others and poor focus due to ADHD by mid-day despite medications.  <u>Id.</u>  Ms. Coulter concluded that "based on his presentation over the past year there has been marked difficulty for him in securing and maintaining employment."  <u>Id.</u>  Nine days later, Ms. Coulter noted during a therapy session that Plaintiff appeared agitated upon arrival and seemed to become calmer as the session went on.  <u>Id.</u> at 1398.  He reported recently punching a hole in a door during a dispute with his girlfriend about how to cook steaks, and that he talked about hitting "things" and saw people as "thing," but that he had not hit anyone recently.  <u>Id.</u>

On October 10, 2019, Lan Yang, Psy.D., performed a psychological consultative examination.  <u>Tr.</u> at 1153-57.  Dr. Yang discussed Plaintiff's history of psychiatric

hospitalizations and aggressive behaviors toward "everyone," including wielding a knife to his stepfather and hitting his mother's car with a bat, and his ongoing outpatient psychiatric services and weekly therapy sessions.  Id. at 1153.  Dr. Yang noted Plaintiff's difficulty falling asleep, lack of appetite, mood fluctuations, loss of interest in things he used to find interesting, anger, concentration difficulties, and social withdrawal, noting that his older, estranged brother had committed suicide two days prior.  Id. at 1154.  Plaintiff reported panic attacks, flashbacks, nightmares, avoidance of people and places, and anger outburst related to childhood trauma, as well as issues with focusing and concentration.  Id.  Plaintiff was cooperative during an MSE, with appropriate appearance and eye contact, normal speech, coherent and goal-directed thought processes, and anxious affect and mood.  Id. at 1155.  Dr. Yang found Plaintiff to be fully oriented, with mostly intact attention and concentration, impaired short-term and long-term memory, average intellectual functioning, and fair insight and judgment.  Id. at 1156.  The doctor diagnosed ADHD by history, unspecified depressive disorder, PTSD, and borderline personality disorder, provisional.  Id. at 1156. [17]  Dr. Yang recommended that Plaintiff continue with his current mental health treatment, and opined that his prognosis was fair given that treatment.  Id.

---

[17]"The essential feature of borderline personality disorder is a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins by early adulthood and is present in a variety of contexts."  DSM-5 at 663.  The doctor also included a diagnosis of substance abuse disorder in remission, based on Plaintiff's report that he had a history of abusing alcohol and other substances ending in 2010.  Tr. at 1155, 1156.

Dr. Yang also completed a medical source statement of ability to do work-related activities (mental).  Tr. at 1158-60.  The doctor opined that Plaintiff had mild impairment in his ability to understand, remember, and carry out simple instructions and to make judgments on simple work-related decisions; moderate impairment in his ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions, and to interact appropriately with supervisor(s) and co-workers; and marked impairment in his ability to interact with the public and respond appropriately to usual work situations and to changes in a routine work setting.  Id. at 1158-59.  Dr. Yang indicated that no other capabilities, such as the ability to concentrate, persist, or maintain pace, and the ability to adapt or manage oneself, were affected by his mental impairments.  Id. at 1159.

Ongoing treatment records from Hall-Mercer indicate that Plaintiff continued to experience anxiety and impulse control problems.  Tr. 1352-1896.  For example, on October 18, 2019, Ms. Coulter noted that Plaintiff appeared "less angry and more sad" about the loss of his brother, and that "he is still struggling with getting lost in thought." Id. at 1413.  Later the same month, Plaintiff told Dr. Yu that he was "not handling things too well" following his brother's suicide, and reported feeling more depressed and angry, isolating himself, and having trouble eating and sleeping.  Id. at 1419.  MSE revealed irritable mood and affect, concrete thought process, limited insight, and otherwise normal findings.  Id. at 1421.  Dr. Yu assessed Plaintiff with ADHD, PTSD, mood dysregulation, increased depression with irritability, and sleep and appetite problems, and increased his dose of clonidine.  Id.

14

On August 31, 2020 -- after the closed period at issue -- Ms. Coulter noted that during a telephone session (due to the COVID-19 pandemic) Plaintiff "was irate over issues with his medication . . . and showed no interest in discussing anything else," and "made threats of coming to Hall-Mercer and creating a scene." Tr. at 1665.  On December 14, 2020, Plaintiff reported that his girlfriend obtained a protection order against him and that he moved out of their home and into a tent in the woods with his uncles and his dogs.  Id. at 1715.  He also stated that he stopped therapy "because she kept trying to schedule app[ointmen]ts when I had to work."  Id.

On July 8, 2021, Dr. Yu submitted a medical source statement in which she found essentially the same limits as in her prior statement of April 2019.  Tr. at 2176-80.

### C.   **Other Evidence**

As previously noted, Plaintiff testified at two administrative hearings -- the first on September 26, 2019, within the closed period at issue, tr. at 56-82, and the second on July 8, 2021, after Plaintiff started working.  Id. at 38-55.[18]  At the first hearing, Plaintiff testified that he could not work because of depression, anxiety, ADD (attention deficit disorder), ADHD, and PTSD.  Id. at 63.  He described two failed attempts to work earlier in 2019, the first of which lasted about three weeks and required him to drive trucks up and down a hill to be cleaned, even though he did not have a driver's license and could

---

[18]The ALJ stated during the second hearing that Plaintiff's testimony from the first hearing "will be incorporated so we don't need to go over the same things we went [over] last time."  Tr. at 43.  In her written decision she stated that she re-reviewed and incorporated the testimony from Plaintiff's first administrative hearing.  Id. at 22.

not focus on driving.  Id. at 64-65, 66-67.  The second job entailed washing dishes and was physically and mentally harder and required him to do too much on his own.  Id. at 64-65, 67-68.  Plaintiff testified that his depression, anxiety and ADD caused him to lose focus within the first thirty minutes on the job, that he would snap at his boss for telling him to do something that he did not want to do, and that the boss had to chase him down and tell him to get back to work.  Id. at 65, 69.

Plaintiff also testified at the September 26, 2019 hearing that he started mental health treatment when he was released from jail, and that it helps "[t]o a certain extent," tr. at 63, by giving him more coping mechanisms when his anger is triggered.  Id. at 64. He treats with a therapist once per week and with a psychiatrist once every thirty -to-ninety days.  Id. at 70-71.  Medications prescribed by his psychiatrist help with his focus, id. at 69, but he frequently snaps at people and gets angry and loud, even when on the medications.  Id. at 76.  A typical day consists of getting up and spending the day at home, except for going around the corner to check on his father.  Id. at 74-75.  He watches television or listens to music in bed with his feet up, uses a heating pad or TENS unit for his physical pain, and makes himself simple food like sandwiches or Ramen noodles.  Id. at 75.  He gets rides to and from his mental health treatment sessions in the city.  Id.[19]

---

[19]Plaintiff's testimony at the first hearing regarding his mental health status is generally consistent with the symptoms and limitations described in the Function Report dated March 26, 2018, when Plaintiff lived in a shelter shortly after his release from jail. Tr. at 402-15.  For example, the first condition Plaintiff listed in his Function Report was "lack of attention," id. at 402, and he described having "anger issues, sometimes difficulty getting along with others, but nothing major." Id. at 407.  He took medications

16

At the July 8, 2021 hearing, Plaintiff's counsel stated that Plaintiff had started working with his friends doing warehouse work, and that although Plaintiff could not perform heavy work because it aggravated his back condition and he dropped something and fractured his foot, "he needed to work and he felt that he could."  Tr. at 44; see also id. at 47 (Plaintiff's testimony regarding his back and foot injuries).  As a result, by August 1, 2020, Plaintiff began working as a subcontractor for the same company, "as he can, when he can," accompanying a friend who transported workers to and from different job sites.  Id. at 45; see also id. at 47 (Plaintiff's testimony that he was offered a position "as like a co-driver to take people back and forth").  Plaintiff explained that the driver provides him with good support, and that "I feel comfortable continuing on this work with him as long as my back and health will allow it."  Id. at 48.  He also credited his ability to work on having the power to remove passengers he could not cope with from his delivery list, employing coping mechanisms such as listening to music when frustrated, and having a dog for emotional support.  Id. at 48-49.

A VE did not testify at Plaintiff's first administrative hearing.  At the second hearing, a VE was called and was advised by the ALJ that Plaintiff had no past relevant work.  Tr. at 50.  The ALJ and counsel asked the VE a series of hypothetical questions.  Id. at 51-54.  Most pertinent to this action, the ALJ asked the VE to consider a

---

to handle stress, did not handle changes in routine very well, and was anxious about where he would be living.  Id. at 408.  He described his activities as watching television, reading, and going to doctor appointments, and stated that he could do laundry and clean. Id. at 403-04.

hypothetical individual of Plaintiff's age and education who could perform medium work except for occasional overhead reaching and frequent reaching in any direction with the right upper extremity; never climb ladders, ropes, or scaffolds; never work at unprotected heights; occasional exposure to machinery, humidity, wetness, vibrations, and extreme cold and heat; limited to simple and routine tasks, with simple work-related decisions and occasional contact with the public, supervisors, and co-workers.  Id. at 51.  The VE responded that such an individual could perform medium jobs such as cleaner, bagger, and door handle assembler.  Id.  With the added limitation of being off-task 20% of a normal workday, the VE testified that the individual could not perform any jobs.  Id. at 53.  Similarly, if the individual had a marked limitation in the ability to respond appropriately to usual work situations and changes in the routine work setting, the VE testified that such a limitation would be work-preclusive.  Id. at 54.

### D.   **Consideration of Plaintiff's Claims**

As previously noted, Plaintiff argues that the ALJ (1) erroneously considered the mental health opinion evidence and (2) failed to include all credibly established limitations in hypothetical questions posed to the VE.  Docs. 10 & 14.  Defendant responds that the ALJ's decision is supported by substantial evidence.  Doc. 11.

### 1.   ALJ's Consideration of Medical Opinion Evidence

Plaintiff first argues that the ALJ failed to properly consider the medical opinion evidence related to Plaintiff's mental impairments.  Doc. 10 at 4-22; Doc. 14 at 1-10.  Defendant counters that this aspect of the ALJ's opinion is supported by substantial evidence.  Doc. 11 at 7-19.

As previously noted, the ALJ found that Plaintiff's severe impairments included HIV, posttraumatic osteoarthritis of the right shoulder, bipolar disorder, ADHD, and PTSD. Id. at 17. Also as previously noted, the ALJ found that Plaintiff had no marked or extreme limitations in the paragraph B areas of functioning, but that the limitations in each area of functioning was either mild or moderate. Id. at 19-21. In making these findings, the ALJ presented a narrative summary of the medical record, summarized Plaintiff's testimony, and discussed the medical opinion evidence, consideration of which is governed by regulations, in effect since March 27, 2017, that focus on the persuasiveness of each medical opinion. "We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 416.920c(a).[20] The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, treatment relationship including the length and purpose of the treatment and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program. Id. § 416.920c(c). The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others. Id. § 416.920c(b)(2).

---

[20]Prior regulations governing applications filed before March 27, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources. 20 C.F.R. § 416.927.

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer 186 F.3d at 429 (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)); see also Plummer, 186 F.3d at 429 (same).

Plaintiff argues that the ALJ erred in her consideration of five mental health opinions rendered by four sources.  I will address each opinion separately, beginning with the ALJ's consideration of Dr. Gavazzi's opinion rendered in May 2010, nearly eight years before the closed period at issue:

> [Dr. Gavazzi] found that [Plaintiff] had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation, each of extended duration ([tr. at 1171]).  Dr. Gavazzi opined that [Plaintiff] had a medically documented history of a chronic organic mental (12.02), schizophrenic, etc. (12.03), or affective (12.04) disorder of at least two years' duration that had caused more than a minimal limitation of ability to do basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate ([id. at 1172]).  I find this opinion to be not persuasive, as it addresses a period that is not before me.  [Plaintiff] met the listing at that time, but for purposes of the present evaluation, his condition is not as severe as to meet the corresponding listing.  His condition has improved significantly to the point that he has been able to function better, including performing some work activities and

> working on obtaining his CDL license ([id. at 1137]).
> Additionally, his [MSE]s have been generally not that bad . . . .

Id. at 27.

Plaintiff argues that the ALJ erred in rejecting Dr. Gavazzi's opinion primarily because the regulations require a longitudinal approach to the medical record.  Doc. 10 at 13; Doc. 14 at 9.  Indeed, a longitudinal approach is generally helpful in cases involving mental health impairments.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(5)(a) ("Longitudinal medical evidence can help us learn how you function over time, and help us evaluate any variations in the level of your functioning.").  Thus, Plaintiff argues that Dr. Gavazzi's opinion, when considered together with evidence from during and after the closed period at issue (February 27, 2018, through August 1, 2020), including Dr. Yu's opinion rendered in July 2021, demonstrates a continuum of disabling limitations that would logically have extended through the closed period.

Plaintiff's argument is internally inconsistent and ultimately unsuccessful. Plaintiff converted his SSI application to a closed period by acknowledging that he started working on August 1, 2020, see tr. at 44, thus conceding that his mental health impairments have had different limiting effects on him over time.  And in his reply brief Plaintiff favorably quotes language stating that "a claimant's level of functioning can vary considerably over time."  Doc. 14 at 9 (quoting Fithen v. Comm'r of Soc. Sec., No. 15-cv-213, 2016 WL 1381822, at *8 (S.D. Ohio Apr. 6, 2016)).  Thus, Plaintiff's relatively poor adjustment in 2010, eight years prior to his alleged disability, does not establish Plaintiff's functioning during the relevant period.

The variable nature of mental health limitations is illustrated in Plaintiff's own case.  For example, although Dr. Yu opined in April 2019 (during the closed period) that Plaintiff was unable to work due to the limiting effects of his mental health impairments, the same doctor opined in July 2021 (after the closed period) that his opinions remained unchanged, even though Plaintiff had started working in the interim.  In short, contrary to Plaintiff's suggestion, the longitudinal picture here indicates that Plaintiff was adjudicated as disabled when he was a minor and again in 2010, shortly before his incarceration, that he was incarcerated from 2010 until March 2018, and that he started working in August 2020.  Id. at 44.  Given this variable level of functioning over time, I conclude that the ALJ did not err by finding Dr. Gavazzi's 2010 opinion not persuasive.

As for the two opinions of Dr. Yu, the ALJ stated the following:

> Psychiatrist Dr. Yu prepared an opinion in April 2019 in which she found [Plaintiff] was limited but satisfactory or seriously limited in all but one mental ability and aptitude needed to do work (adhering to basic standards of neatness and cleanliness) ([tr. at 1144]).  She opined that [Plaintiff] would be absent from work more than three days per month ([id. at 1145]).  She found that [Plaintiff's] mental disorder was "serious and persistent"; that is, [Plaintiff] had a medically documented history of the existence of the disorder over a period of at least two years, and there was evidence of both medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that was ongoing and that diminished [Plaintiff's] symptoms and signs of his mental disorder, and marginal adjustment, that is, [Plaintiff] had minimal capacity to adapt to changes in his environment or to demands that were not already part of his daily life ([id. at 1146]).  This opinion is not well supported by Dr. Yu's treatment records or the explanation for her opinion. [Plaintiff] had generally normal [MSE]s by Dr. Yu.  The only explanation Dr. Yu provided for her opinion was that [Plaintiff] was enrolled in mental health treatment since

childhood and had attention issues and difficulty with childhood and had attention issues and difficulty with authority, which made changes and new demands difficult for him.  This opinion is also not consistent with the other evidence of record.  [Plaintiff's] other [MSE]s . . . do not reflect such a degree of limitations as Dr Yu found [Plaintiff] to have, and as such, this opinion is found to be not persuasive for the period before me.

[I]n July 2021, Dr. Yu submitted a medical source statement essentially giving [Plaintiff] the same limits the provider imposed back in April 2019 ([tr. at 2176-80]).  The opinion is not persuasive, echoing the rationale in the preceding paragraph.  Further, the opinion is inconsistent with [Plaintiff's] returning to work, and the fact that as a result, he is now requesting a closed period of disability.  Lastly, corresponding progress notes do not show any significant objective mental status abnormalities near the time Dr. Yu completed the form ([id. at 1351-1896]).  Records prior to that also suggest largely stable moods and increased focus with medications (see for example [id. at 1472]).

Id. at 27-28.  Plaintiff argues that the ALJ erroneously rejected Dr. Yu's opinions

primarily because the ALJ relied on her lay conclusion that Plaintiff's MSE findings were

"generally not that bad," and because MSE findings are only one component used to

assess a claimant's impairments.  Doc. 10 at 19-21 (citing 20 C.F.R. Part 404, Subpt. P,

App. 1, § 12.00(C)(2), (F)(3)(c)).

As for Dr. Yu's April 2019 opinion, the ALJ properly focused on the

supportability and consistency of the doctor's opinion in comparison to the doctor's own

treatment notes and the record as a whole.  Regarding supportability, the ALJ correctly

noted that Dr. Yu's opinion is not supported by the MSEs.  For example, for nearly every

visit between April 2018 and September 2020, Dr. Yu noted mostly normal findings on

MSE, except for variations as to Plaintiff's mood which were noted in quotations,

suggesting that mood was a subjective report rather than an objective finding.  See, e.g., tr. at 787 (4/17/18, mood "frustrated, pissed off, overwhelmed, a little bit lay back," other findings normal), 1072 (6/10/19, mood "worried," other findings normal), 1367 (8/26/19, mood okay, affect euthymic, insight limited, other findings normal), 1421 (10/28/19, mood and affect irritable, concrete thought process, limited insight, other findings normal).  Plaintiff told Dr. Yu that he was working on his GED (id. at 788) and that his psychiatric medications had been helpful (id. at 1016).  Notably, Dr. Yu maintained Plaintiff on clonidine and Seroquel throughout the relevant period, and added only Adderall in February 2019, which suggests the regimen remained helpful.  Id. at 874.

Regarding consistency, the ALJ properly found that Dr. Yu's opinion is not consistent with the record as a whole.  See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (reading ALJ's decision "as a whole").  For example, on Plaintiff's alleged onset date, February 27, 2018, he presented as stable, maintained good eye contact and broad affect, and denied any current mental health issues, and his mental health assessment yielded normal results, with no impairments noted.  Tr. at 576-77.  One month later, an MSE performed at Hall-Mercer revealed essentially normal findings, and Plaintiff indicated that he had family and friends as sources of support and strength.  Id. at 772-73.  In September 2018, Ms. Coulter at Hall-Mercer described Plaintiff as "dedicated to coming in regardless of lengthy commute" and noted that he is "organized and keeps a planner of all appointments."  Id. at 868.  As noted in the medical summary, Plaintiff's mental health fluctuated over the course of weekly sessions with Ms. Coulter, with periods of difficulty often coinciding with the health of family members, the suicide of

his brother, and relationship issues with his girlfriend.  As noted by the ALJ, the record suggests a trend of improvement with treatment.  Plaintiff testified that he learned coping mechanisms with help to some extent (id. at 63, 64) and he told Ms. Coulter that he felt able and attempted to work (id. at 1042), went fishing (id. at 1029) and to the beach (id. at 1023), got his driver's license and enjoyed the freedom of movement (id. at 989), attempted a second job at a restaurant which he left "out of a need to care for his family members" (id. at 963), repaired a section of his roof (id. at 1583), traveled out of town to visit a dying relative (id. at 1601), and ultimately made a successful transition to work when the right opportunity appeared (id. at 47-48).

Plaintiff argues that the ALJ improperly relied on MSE findings because they do not necessarily provide useful measurements regarding social limitations, relying on two district court cases from outside the Third Circuit.  Doc. 10 at 20 (citing Adams v. Astrue, No. C12-901, 2013 WL 308965, at *2 (W.D. Wash. Jan. 7, 2013); Hartman v. Bowen, 636 F. Supp. 129, 131-32 (N.D. Cal. 1986)).  Courts in the Third Circuit, however, often review MSEs together with treatment notes to determine whether a physician's assessment is consistent with the record as a whole.  See, e.g., Robertson v. Comm'r of Soc. Sec., Civ. No. 16-4688, 2017 WL 4330360, at *11 (D.N.J. Sept. 28, 2017) (affirming where ALJ gave great weight to opinion of non-examining doctor based on consistency with MSE's and limited health evidence and treatment); Garlick v. Colvin, Civ. No. 16-119, 2017 WL 4269885, at *1 n1. (W.D. Pa. Sept. 26, 2017) (affirming where ALJ relied on MSE's and stable condition supported opinion of state agency reviewing psychologist); Mysnyk v. Colvin, Civ. No. 15-269, 2017 WL 819875, at 1 n.1

(W.D. Pa. Mar. 2, 2017) (affirming where ALJ relied on MSE and non-compliance to consider plaintiff's credibility).  Here, it is noteworthy that the record includes multiple MSEs with mostly normal findings, spanning most of the closed period at issue, which reduces the likelihood that one or two snapshots would provide a misleading picture of Plaintiff's status.  Also, portions of the reports on which Plaintiff relies are self-reports regarding his current functioning, such as his response to various stressors, rather than observations or conclusions of the treatment providers.  More importantly, the ALJ did not rely solely on the MSEs, but also noted Plaintiff's own reported activities during sessions with his therapist and psychiatrist -- the same sessions at which MSEs were performed, as previously summarized -- which together with other record evidence demonstrates a general trend of improvement during the closed period in question, culminating in Plaintiff's successful transition to work.

Additionally, state agency psychological consultant Dr. Milke opined in April 2018 that Plaintiff had moderate limitation in interacting with others and mild limitations in other areas of functioning, tr. at 88, and therefore maintained the ability to understand, retain, and follow simple instructions and directions.  Id. at 93-94.  The ALJ found Dr. Milke's opinions to be partially persuasive "as the overall record supports and is consistent with a conclusion that [Plaintiff] is limited to simple, routine tasks and simple work-related decisions," but that Plaintiff had moderate difficulty with concentration, persistence, or pace, rather than mild limitation as found by Dr. Milke.  Id. at 27.  Dr. Milke's findings are inconsistent with those of Dr. Yu and constitute further support for the ALJ's rejection of Dr. Yu's April 2019 opinion.

As previously explained, Dr. Yu also completed a medical source statement in July 2021, in which she opined that Plaintiff had essentially the same limits found by the doctor in April 2019.  Tr. at 2176-80.  The ALJ's rejection of Dr. Yu's second opinion is supported for all of the same reasons discussed in connection with the doctor's first opinion.  Additionally, the ALJ correctly noted that Dr. Yu's July 2021 opinion is inconsistent with Plaintiff's successful transition to work beginning in August 2020, which resulted in a closed period of disability.  Thus, I find that the ALJ did not err in rejecting Dr. Yu's opinions.

Next, the ALJ assessed the opinion evidence of Ms. Coulter as follows:

> In September 2019, Hilary Coulter, LSW submitted a letter indicating she has seen [Plaintiff] for therapy and over the last year he attempted jobs and struggled to maintain the same. She also noted difficulty with interactions with others and poor focus due [to] ADHD by mid-day despite medications. . . .  She concludes that based on his presentation over the past year, there has been marked difficult[y] for him securing and maintaining employment ([tr. at 2182]).  The opinion is not persuasive as it lacks a function by function analysis of what [Plaintiff] could still do despite his impairments.  The [RFC] is the most one can do, not the least.  However, Ms. Coulter offers primarily conclusory statements on an issue reserved to the Commissioner.  More importantly, her findings are not entirely supported by the contemporaneous treatment records. For example, in September 2019, he was noted to show dedication in coming to treatment regardless of a long commute to get into downtown, consistently taking his medication with benefit, and balancing several responsibilities to find time for therapy ([id. at 1392]).  As for another example, Ms. Coulter's notes in August 2019 reflect [Plaintiff] left a job to care for his family members and left that job on good terms ([id. at 963]).

Id. at 28.  Plaintiff argues that the ALJ erred in her evaluation of Ms. Coulter's opinion.
Doc. 10 at 14-15.  However, for the same reasons discussed immediately above in the
context of Dr. Yu's opinions, the ALJ adequately explained why Ms. Coulter's opinions
are not entirely supported by her own treatment notes and the record as a whole.
Additionally, Ms. Coulter's letter did not identify what Plaintiff could do despite his
impairments or explain any specific work-related limitation.  See 20 C.F.R.
§ 416.913(a)(2) (defining "medical opinion" as "a statement from a medical source about
what you can still do despite your impairment(s) and whether you have one or more
impairment-related limitations or restrictions" in listed abilities).

Finally, the ALJ addressed the opinion of consultative examiner Dr. Yang:

> Dr. Yang prepared an opinion in October 2019 in which she
> found that [Plaintiff] had mild restriction for understanding,
> remembering, and carrying out simple instructions and the
> ability to make judgments on simple work-related decisions
> ([tr. at 1158]).  She opined that [Plaintiff] had moderate
> restriction for understanding, remembering, and carrying out
> complex instructions, the ability to make judgments on
> complex work-related decisions, and interacting appropriately
> with supervisor(s) and co-workers ([id. at 1159]).  She found
> that [Plaintiff] had marked restriction for interacting
> appropriately with the public and responding appropriately to
> usual work situations and to changes in a routine work
> setting.  This opinion is partially supported by Dr. Yang's
> consultative examination. . . .  On [MSE] by Dr. Yang,
> [Plaintiff] was a bit restless ([id. at 1155]), his affect was
> anxious, he reported feeling anxious and on edge that day, his
> short-term and long-term memory appeared to be impaired,
> and he demonstrated fair insight and judgment, but otherwise
> this [MSE] was normal.  This opinion is also partially
> consistent with the overall evidence of record, which supports
> the mild to moderate restrictions identified, but not the
> marked, as [Plaintiff's MSE]s have been essentially normal,
> with the exception of fair insight/judgment on one of the

> examinations.  This does not sustain the conclusion of marked
> [limitation in] interacting with others and responding
> appropriately to usual work situations and changes in a
> routine work setting.  [Plaintiff] had hospitalizations when he
> was young, and previously his treatment supported a
> conclusion of listing-level severity.  However, the record
> before me shows that he functions reasonably well and is not
> prevented from working within the limitations I am assigning.

Id. at 29.

Plaintiff argues that the ALJ erred in her evaluation of Dr. Yang's opinion, essentially for the same reasons noted above as to Dr. Yu's opinions, and because Dr. Yang's opinions are consistent with those of Dr. Yu.  Doc. 10 at 9-11.  As to supportability, however, the ALJ explained that except for anxious appearance, impaired memory, and fair insight and judgment, Dr. Yang's MSE was otherwise generally unremarkable, tr. at 29, 1156, and more importantly, Dr. Yang's opinions were inconsistent with the record as whole for the same reasons previously discussed, including Plaintiff's self-reported activities and successful transition to work while carrying the same diagnoses and undergoing essentially the same treatment regimen as during most of the closed period in question.

For all of these reasons, I conclude that the ALJ properly considered the medical opinion evidence and did not reject any evidence "for no reason or for the wrong reason." Rutherford, 399 F.3d at 554; Plummer, 186 F.3d at 429.  Because the ALJ adequately explained why the record supports mild-to-moderate limitations during the relevant period, not marked, I find this aspect of the ALJ's opinion is supported by substantial evidence.

2.     ALJ's RFC Assessment and Hypothetical to the VE

Plaintiff next argues that the ALJ failed to include all of Plaintiff's credibly established limitations in her hypothetical question to the VE.  Doc. 10 at 22-23. Defendant counters that this aspect of the ALJ's opinion is supported by substantial evidence.  Doc. 11 at 19-21.

The RFC assessment is the most a claimant can do despite his limitations.  20 C.F.R. § 416.945(a)(1).  In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe.  Id. § 416.945(a)(2).  However, the ALJ is not required to include every impairment a clamant alleges.  Rutherford, 399 F.3d at 554.  Rather, the RFC "must 'accurately portray' the claimant's impairments," meaning "those that are medically established," which "in turn means . . . a claimant's *credibly established limitations*."  Id. (emphasis in original) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984), and citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)); Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999)).  The ALJ must include all credibly established limitations in the RFC and in the hypothetical posed to the VE.  Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).

"In making a[n RFC] determination, the ALJ must consider all evidence before him."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  Obviously, this includes medical opinion evidence, which the ALJ thoroughly discussed as set forth at length in the previous section.

Plaintiff argues that had the ALJ accepted the opinions of Dr. Gavazzi, Dr. Yu, Dr. Yang, and/or Ms. Coulter, then consistent with the VE's testimony, see tr. at 53-54, Plaintiff would have been found disabled.  Doc. 10 at 7, 22-23.  Instead, as previously explained, the ALJ determined that Plaintiff retains the RFC to perform a limited range of medium work.  Tr. at 483-83.  In support of this RFC assessment, the ALJ summarized the medical record and Plaintiff's own statements regarding his functioning, and considered the opinion evidence as discussed in the previous section.  Consistent with my finding that the ALJ properly considered the opinion evidence in relation to the entire record, I further find that the ALJ's RFC assessment and hypothetical to the VE incorporated Plaintiff's limitations as they existed during the closed period in question.  Therefore, I find that this aspect of the ALJ's opinion is supported by substantial evidence.

## V.    <u>CONCLUSION</u>

The ALJ properly evaluated the medical opinion evidence, properly assessed Plaintiff's RFC, and properly relied on the VE's testimony.  Therefore, I find that the ALJ's decision is supported by substantial evidence.

An appropriate Order follows.